## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

FRANK "NITTY" SENSABAUGH,

    Plaintiff,

v.                              Case No. 20-CV-1502

MICHAEL KRZNARICH, *et al.*,

    Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

## INTRODUCTION

Frank "Nitty" Sensabaugh alleges that he and others were engaged in a peaceful protest when they entered onto Interstate 794 and blocked rush-hour traffic over the Hoan Bridge on the evening of June 2, 2020. When Milwaukee County sheriff's deputies tried to remove the protestors from the highway, Nitty contends he was singled out, tackled, and arrested without justification.

Nitty's telling of these events is inaccurate, and his narrative avoids the actual reasons for the officers' actions and his arrest. But those are matters for a later stage of this case. The present motion takes aim at a different aspect of the case: Nitty's effort to hold Milwaukee County and a Milwaukee County Sheriff's Office supervisor, Captain Tricia Carlson, vicariously liable under 42 U.S.C. § 1983 for what occurred in connection with his arrest. Indeed, the claims against the County and Captain Carlson fail as a matter of law, even assuming that the factual allegations in Nitty's complaint were true.

Nitty's theory against Captain Carlson—that she "ratified" the officers' conduct by reviewing and signing off on a report after the fact—has been rejected by the Seventh Circuit. And

the claim against the County is even weaker because there is no allegation, as there must be, that any County policy, widespread practice, or policymaker caused the purported violation of Nitty's rights. Instead, all Nitty argues is that the County should have done something more to prevent the individual defendants' actions. Even if that were so, however, it is a patently insufficient ground to hold a municipality liable under § 1983 because it would collapse the applicable standard of fault into *respondeat superior* liability—the very result the Supreme Court has rejected and warned against for decades.

The real reason Nitty tries to shoehorn a claim against the County into his complaint—as is revealed by his demands for relief—is that he seeks to insert the Court into rewriting the Milwaukee County Sheriff's Office's policies regarding substantive law enforcement standards, revamping its training and recruiting, restricting deputies' ability to use force even when they face threats and unlawful resistance, and overhauling its disciplinary procedures by issuing a sweeping structural injunction against the County. Under the law, Nitty has no right to demand such extraordinary relief. In the first place, he has no viable underlying claim against the County upon which to base a request for an injunction. Furthermore, even if he did have such a claim, he still has no standing to seek an injunction, and the order he proposes would violate principles of equity and federalism established decades ago by the Supreme Court and reaffirmed many times since.

For these reasons, and as is explained in greater detail below, this Court should grant partial judgment on the pleadings dismissing Nitty's claims against Milwaukee County and Captain Carlson, including his request for injunctive relief against the County, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## NITTY'S CLAIMS AND ALLEGATIONS

In his complaint, Nitty asserts claims under 42 U.S.C. § 1983 against two sets of defendants. His initial claims are against the individual officers whom he identifies as having been

personally involved in his arrest and the surrounding events. But he also brings derivative claims against Milwaukee County and a Sheriff's Office supervisor on the theory that they "ratified" the officers' allegedly unconstitutional conduct after-the-fact.

### A. Nitty's Claims Against Officers Involved in the Events of June 2.

Nitty alleges the following relevant facts, which are taken as true solely for purposes of this motion. According to Nitty, after the death of George Floyd and amidst the nationwide protests that followed, he began organizing protests in Milwaukee (and beyond). (Compl. (ECF No. 1-1) ¶¶ 3, 27.) While acknowledging that "a few protestors" have been "destructive," Nitty asserts that he and his supporters have been peaceful at all times. (*Id.* ¶¶ 28-29.)

At about 6:15 pm on Tuesday, June 2, 2020, a group of protestors led by Nitty marched onto Interstate 794 at the foot of the Hoan Bridge. (*Id.* ¶ 38.) As shown in the video cited in the complaint, officers on the Sheriff's Office's Mobile Response Team ("MRT") attempted to move the protestors off the highway. (*Id.* ¶ 37 n.1.)[1]

Nitty claims that, in doing so, the officers singled him out and arrested him due to his race and because he was exercising his First Amendment rights to protest. (*Id.* ¶¶ 8, 37.) According to the complaint, Sergeant Sarah Byers, Deputy Sheriff Corie Richardson, and Sergeant Michael Krznarich first used what Nitty alleges were "gas cannisters" on the protestors. (*Id.* ¶ 40.)[2] Then, at Sergeant Krznarich's direction, Deputy Sheriffs Brandon Rogers, Daniel Humphreys, and Steven Haw took Nitty into custody. (*Id.* ¶¶ 42, 44, 45.) The deputies (it is not clear from the

---

[1] The complaint also alleges a separate incident on June 1, 2020. Nitty and other protestors were allegedly walking home from a march when unidentified "law enforcement" personnel purportedly met them with an armored vehicle, rushed them with batons, and "severely tear gassed" Nitty and others. (Compl. ¶¶ 30-36.) There is no allegation, however, that the defendant officers were involved in this incident, and Nitty does not assert any claims against them based on the events of June 1.

[2] Defendants deny that tear gas was used at any point during the events surrounding plaintiff's arrest. (Answer (ECF No. 6) ¶¶ 102-103.)

complaint which one or ones) allegedly "body slammed" Nitty, piled on top of him, and caused his arms and hand to bleed. (*Id.* ¶¶ 9, 46.) An unidentified deputy allegedly pointed a firearm at him. (*Id.* ¶ 43.) Nitty alleges he was initially placed in handcuffs that were too tight. (*Id.* ¶¶ 9, 47.) Nitty was arrested, placed in the back of a squad car, taken to the hospital for treatment of his injuries, and then to a Sheriff's Office facility for questioning. (*Id.* ¶¶ 46, 57, 58.) Nitty claims that Sergeant Krznarich falsely prepared a report stating that he had seen Nitty holding and swinging a glass bottle and that he saw a broken bottle on the ground and broken glass in Nitty's backpack following his arrest. (*Id.* ¶ 59.)

Nitty asserts four claims against the officers arising from their alleged conduct on June 2. Count One claims that they "retaliated" against Nitty for exercising his First Amendment right of speech and protest. (*Id.* ¶ 69.) Count Two charges that the officers used "excessive force" and "unlawfully arrest[ed]" Nitty when he "did not commit a crime" and "did not pose a threat" to anyone, in violation of the Fourth Amendment. (*Id.* ¶¶ 76, 78, 79.) Count Three claims they "racially profiled" Nitty, arresting him "because he is an African American," in violation of the Fourteenth Amendment's equal protection clause. (*Id.* ¶ 85.) Finally, Count Four alleges that the officers had a duty to intervene but failed to do so with "deliberate indifference" to Nitty's constitutional rights. (*Id.* ¶¶ 91, 95.)

## B.     The "Ratification" Claim Against Captain Carlson and Milwaukee County.

Piggybacking on his four core claims against the officers allegedly involved in the arrest on June 2, Nitty also asserts a further, derivative claim against Captain Tricia Carlson and Milwaukee County. There is no allegation that Captain Carlson was present or personally involved in Nitty's arrest, nor that she directed it or even knew about it at the time. Instead, Nitty alleges only that she reviewed and approved Sergeant Krznarich's report after the fact and thus supposedly

4

"ratified [Krznarich's] lies," although there is no allegation that she knew or had any reason to know the report was (allegedly) inaccurate. (*Id.* ¶ 60.)

The allegation against Milwaukee County is even more conclusory. There is no assertion that any County policy or policymaker was responsible for the events of June 2 or that Carlson's supposed misconduct was somehow imputable to the County. Yet, Count Five of the complaint asserts a claim directly against both Carlson and Milwaukee County for violating Nitty's constitutional rights through "ratification." (*Id.* ¶¶ 97-100.)

### C.    Nitty's Demand for Injunctive Relief Against the County.

As noted above, the first four counts of the complaint are directed solely at the officers who were supposedly personally involved in the events of June 2. Although Milwaukee County is not named as a defendant in any of those counts, Nitty nevertheless alleges that the County "never should have allowed [the June 2] attack to occur." (*Id.* ¶ 10.) And he ends each of these counts with a demand for "injunctive relief to have Milwaukee County implement and enforce constitutional policies to prevent further unlawful conduct by the Defendants." (*Id.* ¶¶ 74, 82, 89, 96.)

What Nitty is demanding becomes clearer in Count Six, which takes his complaint one very large and unsupported step further. In Count Six, Nitty asks the Court to "adopt and enforce" a sweeping structural injunction "to prevent future violations of Frank Nitty's and all peoples' constitutional rights." (*Id.* ¶ 114.) His proposed injunction, spanning seven single-spaced pages, makes misplaced assumptions about current practices and would rewrite the policies of the

Milwaukee County Sheriff's Office.[3] For example, Nitty seeks to impose the following requirements:

- The Milwaukee County Sheriff's Office must declare that it is, in Nitty's words, "an anti-racist and anti-discriminatory law enforcement department" and require the members of its force to be "anti-racist, anti-discriminatory public servants." (*Id.* ¶ 114, Section A, Purpose.)

- With narrow exceptions, sheriff's deputies in carrying out their duties "shall not rely to any degree" on a person's "race, color, ethnicity, national origin, economic status, sexual orientation, gender identity or expression, age, gender, religion, limited English proficiency, disability, or housing status." The ban on "bias based profiling" adds to this list ancestry, marital status, political affiliation, cultural group, and "any other identifiable characteristics of an individual rather than the behavior of that individual." (*Id.* ¶ 114, Section A, Policy.)

- Nitty's proposed order would revamp the Sheriff's Office's continuing education program and the training of new recruits. It expressly endeavors to "exceed[ the] requirements established by the state of Wisconsin Law Enforcement Standards Board (LESB) and the Training and Standards Bureau" with the goal of ensuring that "deputies are verifiably competent with all department policies and with the principles of anti-racism and anti-discrimination." To that end, it mandates annual training and an annual written exam, the results of which will be published. Every deputy must display "excellency in anti-racism and anti-discrimination, cultural competency, de-escalation, and communication"—all undefined terms. (*Id.* ¶ 114, Section B.)

- Nitty also seeks to revamp the Sheriff's Office's use-of-force procedures and policies by, for example, requiring a warning before the use of any force. (*Id.* ¶ 114, Section C.) Deputies may never use non-lethal force, including tear gas, pepper spray, and rubber bullets, "at close range or aimed at sensitive areas." Any weapons "designed to disorientate" are likewise prohibited. (*Id.* ¶ 114, Section F.)

- Deputies must always wear a body camera. (*Id.* ¶ 114, Section G.)

- A deputy who observes another deputy using what the observing deputy "believes or knows" to be excessive force "based on his MCSO anti-racist training" has a duty to intervene, or else he "demonstrates a lack of courage" and violates Sheriff's office policies and "well established law." (*Id.* ¶ 114, Section D.)

---

[3] In Wisconsin, of course, the Milwaukee County Sheriff is a separate, duly elected constitutional officer whose powers and duties include, among other things, the maintenance of law and order. *See* Wisconsin Constitution, Art. VI, Section 4; *Wisconsin Prof'l Police Ass'n. v. Dane County*, 106 Wis. 2d 303, 309-11, 316 N.W.2d 656, 659-60 (Wis. 1982); *Andreski v. Indus. Comm'n*, 261 Wis. 234, 240, 52 N.W.2d 135, 137-38 (Wis. 1952).

- The Sheriff's Office must have a presumption in favor of issuing citations instead of making arrests. Any custodial arrest must be cleared by a lawyer. (*Id.* ¶ 114, Section E.)

- A deputy who violates these new policies is subject to a three-strikes rule leading to termination, and where substantial bodily injury or death results, immediate termination is mandatory. (*Id.* ¶ 114, Sections C, D, E, F, G.)

## PROCEDURAL HISTORY

Nitty originally filed his complaint in the Milwaukee County Circuit Court on August 27, 2020. Defendants timely removed this action pursuant to 28 U.S.C. §§ 1441 and 1446 on September 28, 2020. (ECF No. 1.) Defendants filed their answer to the complaint on October 5, 2020. (ECF No. 6.)

## LEGAL STANDARD

A party may file a Rule 12(c) motion "after the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Failure to state a claim upon which relief can be granted is an appropriate ground for such a motion. Fed. R. Civ. P. 12(h)(2)(B). A Rule 12(c) motion challenging the legal sufficiency of the complaint is "governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Adams v. City of Indianapolis,* 742 F.3d 720, 727-28 (7th Cir. 2014). Well-pled factual allegations are accepted as true at the pleading stage, but legal conclusions are insufficient to survive a Rule 12(b)(6) challenge. *Id.* at 728 (citations omitted). Equally insufficient are "threadbare recitals of the elements, supported by mere conclusory statements." *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). The complaint must instead "state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

Additionally, as is explained below with particular attention to the allegations in this case, since "the issue of standing dictates whether this Court has subject matter jurisdiction over the case, it is an appropriate subject for a motion for judgment on the pleadings." *Milwaukee Prof'l*

*Fire Fighters Ass'n v. City of Milwaukee,* 869 F. Supp. 633, 640 (E.D. Wis. 1994) (citations omitted); *see also* Fed. R. Civ. P. 12(h)(3) (recognizing that an absence of subject-matter jurisdiction may be raised at any time).[4] A facial challenge to standing requires a court only to look to the complaint and determine whether the plaintiff has *alleged* an adequate basis for jurisdiction. *See Apex Digital, Inc. v. Sears, Roebuck & Co.,* 572 F.3d 440, 443 (7th Cir. 2009). As under Rule 12(b)(6), the plaintiff's factual allegations are taken as true for purposes of the motion. *Id.* at 444.

Under these controlling standards, Nitty's claims against Milwaukee County and Captain Carlson fall short, and the dismissal of those claims is appropriate pursuant to Rule 12(c).

## ARGUMENT

To be clear, defendants dispute the entirety of Nitty's complaint on both the law and the facts. (*See* Answer (ECF No. 6).) This Rule 12(c) motion, however, takes aim only at the claims against Milwaukee County and Captain Carlson. As demonstrated below, those claims fail as a matter of law on the face of the pleadings because Nitty does not allege the basic elements of ratification under § 1983. Further, since Nitty has no underlying claim against the County, he has no basis upon which to request injunctive relief against the County. In the alternative, even if Nitty had a legally viable claim for ratification against the County, his claim for injunctive relief should still be dismissed under long-standing Supreme Court and Seventh Circuit precedent because he has no standing and no equitable basis to pursue it.

---

[4] Some district courts in this circuit have treated a post-answer challenge to standing or jurisdiction as a motion under Rule 12(b)(1) rather than 12(c). *See, e.g., Consolidated Paving, Inc. v. County of Peoria,* No. 10-cv-1045, 2012 WL 13001935, at *3 (C.D. Ill. Aug. 28, 2012). Either way, the governing legal standard is the same.

# I. NITTY FAILS TO STATE A CLAIM AGAINST MILWAUKEE COUNTY AND CAPTAIN CARLSON.

Nitty's claims against Milwaukee County and Captain Carlson fail to allege any facts that could plausibly support a ratification claim under § 1983.

## A. The Complaint Does Not Allege Any Facts to Support the Claim That Captain Carlson "Ratified" Any Unconstitutional Conduct.

To state a claim under § 1983, a plaintiff must plausibly allege that the defendant bears "personal responsibility" for the claimed constitutional violation. *Crowder v. Lash,* 687 F.2d 996, 1005 (7th Cir. 1982). It is not enough to claim that the defendant was (like Carlson) merely a supervisor of others who allegedly acted unconstitutionally, even if she is alleged to have been negligent in her oversight role. *Rascon v. Hardiman,* 803 F.2d 269, 273-74 (7th Cir. 1986). Instead, the defendant must have "knowingly, willfully, or at least recklessly caused the alleged deprivation by his action or failure to act." *Id.* at 274. "Without a showing of direct responsibility for the improper action, liability will not lie against a supervisory official." *Id.* at 273 (quoting *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir. 1983)). In short, supervisors do not have *respondeat superior* liability under § 1983. *Kernats v. O'Sullivan,* 35 F.3d 1171, 1182 (7th Cir. 1994).

Instead, to hold a supervisor liable, the plaintiff generally must establish that she acted or failed to act with "deliberate or reckless disregard" of the plaintiff's constitutional rights or that the unconstitutional conduct took place "at her direction" or "with her knowledge and consent." *Crowder,* 687 F.2d at 1005. Here, Nitty does not claim that Captain Carlson directed, participated in, or even knew about the events of June 2 as they were taking place. Instead, he asserts that she "ratified" the defendant officers' allegedly illegal conduct only after the fact when she reviewed and approved Sergeant Krznarich's report of the incident. (Compl. ¶¶ 60, 99.)

Ratification is a potentially viable theory of § 1983 liability in limited circumstances "where a supervisor, with knowledge of a subordinate's conduct, approves of the conduct and the

9

basis for it." *Kernats,* 35 F.3d at 1182 (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988)). But, as this formulation makes clear, merely signing off on the conduct alone is insufficient. The supervisor must also know about and approve of the *unconstitutional basis* for the subordinate's actions. *See Darchak v. City of Chicago Bd. of Educ.,* 580 F.3d 622, 630 (7th Cir. 2009) (rejecting ratification claim absent evidence that the supervisor "was aware of any potential retaliatory basis" for the subordinate's action). Moreover, the Seventh Circuit has held that *ex post facto* approval of a subordinate's conduct "is not the type of involvement in a constitutional violation that gives rise to § 1983 liability" against the supervisor. *Kernats,* 35 F.3d at 1182-83 (rejecting ratification claim where supervisor allegedly tried to justify subordinate's illegal conduct "several days later").

Here, Nitty alleges only that Captain Carlson "reviewed and approved Sgt. Krznarich's report and ratified his unconstitutional conduct." (Compl. ¶ 99.) Even assuming for argument's sake that Krznarich's conduct was unconstitutional, the claim against Carlson is legally deficient. The allegation that she "ratified" her subordinate's conduct is conclusory, a "threadbare recital" of the elements entitled to no weight. *Adams,* 742 F.3d at 727-28. Beneath that bare conclusion, there are no alleged facts that could plausibly establish ratification. In the first place, Nitty does not allege that Carlson knew or even had reason to suspect that Krznarich's report contained "lies," as Nitty alleges. (Compl. ¶ 59.) On the contrary, the report on its face appeared to justify Nitty's arrest. (*See id.*) Thus, Nitty does not and cannot allege that Carlson knew or approved of the allegedly unconstitutional basis for Krznarich's conduct (supposed racism and retaliation), as required by *Kernats* and *Darchak*.

Furthermore, even setting that deficiency aside, Nitty admits that Captain Carlson did not review and approve of Sergeant Krznarich's report—the alleged act of ratification—until *after*

Nitty's arrest and the surrounding events had already taken place. (Compl. ¶ 60.) This kind of *ex post facto* approval cannot support a ratification claim under *Kernats*. And, to the extent Nitty relies on his contention that Carlson "never should have allowed [the June 2] attack to occur," *id.* ¶ 10, that, too, is insufficient. A "fail[ure] to stop" unlawful conduct or "to take corrective action" does not give rise to § 1983 liability. *Cygnar v. City of Chicago,* 865 F.2d 827, 847 (7th Cir. 1989). "That argument if accepted would convert every public employee's action that a plaintiff wished to challenge into the action of the employer," effectively creating *respondeat superior* liability, which the Supreme Court has repeatedly and consistently rejected. *Gernetzke v. Kenosha Unified Sch. Dist. No. 1,* 274 F.3d 464, 468-69 (7th Cir. 2001). For these reasons, Nitty's complaint fails to state a plausible claim against Captain Carlson.

### B. The Complaint Does Not Allege Any Wrongdoing by Milwaukee County.

Nitty's ratification claim against Milwaukee County is on even less solid footing. The Supreme Court held in *Monell v. Department of Social Services,* 436 U.S. 658 (1978), and has reaffirmed many times since, that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Instead, "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson,* 563 U.S. 51, 60 (2011). Plaintiffs seeking to hold a municipality liable must prove that "action pursuant to official municipal policy caused their injury." *Id.* These fault and causation requirements prevent federal courts from engaging in "an endless exercise of second-guessing" local governments, which would raise "serious questions of federalism." *City of Canton v. Harris,* 489 U.S. 378, 392 (1989).

To establish municipal liability under § 1983, a plaintiff must normally show: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Waters*

*v. City of Chicago,* 580 F.3d 575, 581 (7th Cir. 2009). This standard distinguishes acts of the municipality itself from those of its employees, which is a vital distinction because "units of local government are responsible only for their policies rather than misconduct by their workers." *Id.*

Nitty does not allege that any express policy or widespread practice of Milwaukee County caused his alleged constitutional injuries. His only route to establishing municipal liability is therefore to show that his injuries were caused by an individual with final policymaking authority. He attempts to do so by claiming that the County "ratified" Sergeant Krznarich's report and alleged unconstitutional conduct. (Compl. ¶ 99.) But, to establish § 1983 liability against a municipality based on a ratification theory, a plaintiff must show that "a municipal official with final policymaking authority approved the subordinate's decision and the basis for it." *Baskin v. City of Des Plaines,* 138 F.3d 701, 705 (7th Cir. 1998). A policymaker must be "at the apex of authority for the action in question." *Vodak v. City of Chicago,* 639 F.3d 738, 748 (7th Cir. 2011). To be clear, "a municipality is not liable merely because the official who inflicted the alleged constitutional injury had the discretion to act on its behalf; rather, the official in question must possess final authority to establish municipal policy with respect to the challenged action." *Fiorenzo v. Nolan,* 965 F.2d 348, 351 (7th Cir. 1992).

Nitty's ratification claim against Milwaukee County is premised on Captain Carlson's alleged ratification of Sergeant Krznarich's supposed unconstitutional conduct. (Compl. ¶¶ 97-100.) As such, Nitty's claim against the County suffers from the same deficiencies as his claim against Carlson herself: Nitty does not allege that Carlson (or the County) approved or even knew about the alleged unconstitutional basis for the officers' conduct on June 2, and, in any event, Carlson's review and approval of Krznarich's report took place after the fact and thus cannot give rise to § 1983 liability. *Kernats,* 35 F.3d at 1182-83. To the extent Nitty contends the County

12

should have done more to prevent his alleged injuries—*e.g.*, by requiring deputies to wear body cameras (Compl. ¶ 60)—that is insufficient to ground a § 1983 claim under *Monell* and its progeny. *See Canton,* 489 U.S. at 392 (rejecting a standard that asks only whether the municipality could have done more because it "would result in *de facto respondeat superior* liability on municipalities").

But there is also a further, more fundamental flaw with Nitty's claim against the County: nowhere does he allege any facts suggesting that Captain Carlson—a mid-level supervisor within the Sheriff's Office—had final policymaking authority concerning the challenged actions on June 2. The only individuals identified in the complaint as even *potential* policymakers are Sheriff Lucas, Dr. Ball, and Atty. Zillig. (Compl. ¶¶ 22-24.) But Nitty does not assert that they were involved in or ratified the events of June 2 in any way. Thus, the complaint does not plausibly allege—indeed, it does not even attempt to allege—that "a municipal official with final policymaking authority approved the subordinate's decision and the basis for it." *Baskin,* 138 F.3d at 705. For these reasons, the claim against the County also cannot stand.

### C. Because Nitty Has No Underlying Claim Against Milwaukee County, He Has No Basis for an Injunction Against the County.

In addition to the ratification claim against Carlson and Milwaukee County in Count Five of the complaint, Nitty also requests "prospective injunctive relief" against the County in a separate Count Six. (Compl. ¶¶ 101-114.) Similarly, Nitty appends to Counts One through Four a separate request for "injunctive relief to have Milwaukee County implement and enforce constitutional policies to prevent further unlawful conduct by the Defendants," even though none of those four counts is asserted against the County. (*Id.* ¶¶ 74, 82, 89, 96.)

"An injunction is a type of remedy…, as distinct from an underlying claim for relief." *Onyango v. Downtown Entertainment, LLC,* 525 Fed. Appx. 458, 460 (7th Cir. 2013) (non-

precedential order) (citations omitted). Therefore, a request for an injunction is not properly denominated as a separate count; whether a plaintiff is entitled to an injunction depends on whether he prevails on his underlying substantive claim (as well as the other prerequisites for injunctive relief). *See id.* As a result, when a plaintiff fails to state a substantive claim, whether under § 1983 or otherwise, dismissal of his request for injunctive relief follows as a matter of course. *See, e.g., Davenport v. Giliberto,* No. 11-CV-6855, 2013 WL 5432822, at *6 (N.D. Ill. Sep. 30, 2013) ("As the undisputed evidence defeats [plaintiff's] substantive claims, there is no basis to enjoin the officers' activities."), *aff'd*, 566 Fed. Appx. 525 (7th Cir. 2014).

Under this case law and as a simple matter of logic, because Nitty's substantive claim against the County fails, his request for injunctive relief against the County also fails. For the foregoing reasons, the Court should dismiss Counts Five and Six of the complaint, as well as Counts One through Four insofar as they seek injunctive relief against Milwaukee County.

## II. EVEN IF NITTY STATED A CLAIM AGAINST THE COUNTY, HE WOULD HAVE NO STANDING AND NO RIGHT TO SEEK THE INJUNCTIVE RELIEF DEMANDED IN THE COMPLAINT.

In the alternative, even if Nitty had stated a plausible substantive claim against Milwaukee County under § 1983, he still would have no standing and no right, as a matter of law, to seek the sweeping, structural injunction demanded in the complaint.

### A. Federal Law Strictly Limits the Availability of Injunctive Relief Against Municipalities.

#### 1. Standing and Equitable Limits on Injunctions in Light of *O'Shea v. Littleton.*

For decades the Supreme Court has enforced strict limitations on the ability of a plaintiff to obtain injunctive relief against a local government under § 1983 and similar laws. Indeed, in *O'Shea v. Littleton,* 414 U.S. 488 (1974), the Court articulated important standing and equitable restraints on the availability of such injunctions. The plaintiff class in *O'Shea* claimed they were

14

the victims of discriminatory enforcement of the criminal law and sought an injunction against the responsible local officials. *Id.* at 490–92. The Supreme Court upheld the district court's dismissal of the lawsuit. *Id.* at 493. The Court held that the complaint fundamentally "failed to satisfy the threshold requirements imposed by Art. III of the Constitution," which mandates "an actual case or controversy" to invoke the jurisdiction of the federal courts. *Id.* To have standing to seek an injunction, a plaintiff must allege that he is "immediately in danger of sustaining some direct injury" that is "both 'real and immediate,'" not merely "'conjectural' or 'hypothetical.'" *Id.* at 494. The Court clarified that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects." *Id.* at 495–96.

In *O'Shea,* the prospect of future injury to the plaintiffs "rest[ed] on the likelihood that respondents will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners." *Id.* at 496. The Court concluded that "attempting to anticipate" whether this prospect would ever come to pass "takes us into the area of speculation and conjecture." *Id.* Moreover, the Court "assume[d] that [plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct." *Id.* at 497. For these reasons, the plaintiffs in *O'Shea* lacked standing to seek an injunction. *Id.* at 498–99.

The Court also gave a second reason for the dismissal of the complaint: even if the plaintiffs had presented a constitutional case or controversy, there was no "adequate basis for equitable relief." *Id.* at 499. The "necessarily conjectural nature of the threatened injury to which respondents are allegedly subjected" did not qualify as a "substantial and immediate irreparable injury" necessary for issuance of an injunction. *Id.* at 502. Further, "principles of equity, comity, and

federalism … preclude[d] equitable intervention." *Id.* at 499. According to the Court, the plaintiffs were requesting "nothing less than an ongoing federal audit of state criminal proceedings," *id.* at 500, which would be "a major continuing intrusion of the equitable power of the federal courts … in sharp conflict with the principles of equitable restraint" it has long emphasized, *id.* at 502.

### 2. The Limits on Injunctions of *O'Shea* as Applied in *Rizzo v. Goode* and *City of Los Angeles v. Lyons*.

#### a. *Rizzo v. Goode*.

The Court applied these same principles in *Rizzo v. Goode,* 423 U.S. 362 (1976), to block an injunction against the Philadelphia police department that sought under § 1983 to "overhaul[ ] police disciplinary procedures." *Id.* at 373. The plaintiff classes presented evidence (which the Court accepted *arguendo*) of sixteen incidents during a single year when Philadelphia police officers violated citizens' constitutional rights. *Id.* at 368. On four of those occasions, the department received citizen complaints but took no action against the offending officers. *Id.* Plaintiffs construed this as a "pervasive pattern" of unconstitutional conduct, particularly directed against minority citizens. *Id.* at 366.

The district court granted a more limited injunction than the one requested by the plaintiffs, and the court of appeals affirmed. *Id.* at 364–66. But the Supreme Court reversed, holding that the plaintiffs lacked standing to seek an injunction. *Id.* at 372–73. The principles announced in *O'Shea,* including the rule that illegal conduct in the past does not in itself create a case or controversy concerning the prospect of future injury, applied in *Rizzo* "with even more force." *Id.* at 372. That was because the claimed threat of "real and immediate" injury depended on "what one of a small, unnamed minority of policemen might do to them in the future." *Id.* This allegation was "even more attenuated" than the prospect of injury in *O'Shea* and was therefore, *a fortiori,* insufficient to create a justiciable controversy under Article III. *Id.*

Moreover, the Court in *Rizzo* concluded (as it did earlier in *O'Shea*) that even if the plaintiffs had standing, there was no equitable basis for the requested injunction against the municipal authorities. *Id.* at 377–80. It emphasized that an injunction should be granted only "sparingly" and "in the most extraordinary circumstances." *Id.* at 378–79. The sweeping injunction sought in *Rizzo*, which rested on the conduct of a small number of officers, violated the traditional equitable rule that "the nature of the violation determines the scope of the remedy." *Id.* at 378.

Additionally, according to the Court in *Rizzo*, "important considerations of federalism" militated against the injunction. *Id.* "When a plaintiff seeks to enjoin the activity of a government agency," he must contend with the "well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Id.* at 378–79. This rule applies even more forcefully within a system governed by principles of federalism. *Id.* at 379. Federal courts must give these principles due consideration when deciding "the availability and scope of equitable relief." *Id.* "When it injected itself by injunctive decree into the internal disciplinary affairs of [a] state agency," the district court in *Rizzo* "departed from these precepts." *Id.* at 380.

**b.** ***City of Los Angeles v. Lyons.***

The Supreme Court expounded on these same principles in *City of Los Angeles v. Lyons,* 461 U.S. 95 (1983). There, the plaintiff claimed that four Los Angeles police officers had placed him in a chokehold without provocation or justification. *Id.* at 97–98. His complaint against the officers and the City of Los Angeles sought both damages and declaratory and injunctive relief. *Id.* at 98. The district court initially granted judgment on the pleadings in favor of the City on the injunctive and declaratory claims, but the court of appeals reversed. *Id.* at 98–99. On remand, the district court entered a preliminary injunction enjoining the use of chokeholds absent a threat of

17

death or serious bodily injury; the injunction also imposed an improved training program, regular reporting, and record keeping. *Id.* at 99–100. The court of appeals affirmed. *Id.* at 100.

But the Supreme Court reversed because it held that "the federal courts are without jurisdiction to entertain [the plaintiff's] claim for injunctive relief." *Id.* at 101. Following *O'Shea* and *Rizzo,* the Court concluded that the plaintiff lacked Article III standing to seek equitable relief. *Id.* at 105–10. The County found unpersuasive his asserted threat of future injury because it depended on a hypothetical prediction that some officer might again stop him and use a chokehold illegally without provocation. *Id.* at 105. His further allegation that "the police in Los Angeles routinely apply chokeholds … [fell] far short" of establishing a case or controversy. *Id.* As the Court explained:

> In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) *that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter,* whether for the purpose of arrest, issuing a citation or for questioning or, (2) *that the City ordered or authorized police officers to act in such manner.*

*Id.* at 105–06 (emphasis added). Even if "among the countless encounters" between citizens and police "there will be certain instances in which strangleholds will be illegally applied," it was "no more than conjecture" to suggest that this exposed the plaintiff to a real and immediate threat of future unconstitutional injury. *Id.* at 108.

Moreover, even if the plaintiff in *Lyons* had standing, the Court explained that the lack of a real and immediate threat meant he had no equitable basis to obtain an injunction. *Id.* at 111. The Court reiterated that "principles of equity, comity and federalism … should inform the judgment of federal courts when asked to oversee state law enforcement authorities." *Id.* at 112. These principles "counsel[ ] restraint in the issuance of injunctions against state officers." *Id.* Overseeing the continuing conduct of state law enforcement authorities "is not the role of a federal court absent

18

far more justification than [the plaintiff] has proffered in this case." *Id.* at 113. On all of these bases, the Court denied the injunctive relief sought by the plaintiff.

### 3. The Seventh Circuit Adheres Closely to *O'Shea, Rizzo,* and *Lyons.*

*O'Shea, Rizzo,* and *Lyons* require the same result here with respect to the injunctive relief sought by Nitty. All three cases strictly limit the availability of sweeping injunctions against a municipality like the one Nitty seeks here, and the Seventh Circuit has adhered closely to these limitations in numerous decisions. *See, e.g.*, *Lopez-Aguilar v. Marion County Sheriff's Dept.,* 924 F.3d 375, 393–98 (7th Cir. 2019) (reversing district court's entry of injunction because plaintiff lacked standing under *O'Shea, Rizzo,* and *Lyons*); *Simic v. City of Chicago,* 851 F.3d 734, 738–39 (7th Cir. 2017) (finding lack of standing to seek injunctive relief); *Palmer v. City of Chicago,* 755 F.2d 560, 578 (7th Cir. 1985) ("The Federal courts have no business whatsoever, meddling in or attempting to control the daily maintenance and administration of the [Chicago Police Department] and the Cook County State's Attorney's Office, absent a clear and defined constitutional violation.").

### B. Nitty Lacks Standing to Seek an Injunction Against Milwaukee County.

Nitty lacks Article III standing to seek the injunctive relief against the County demanded in the complaint. "To have standing, a plaintiff must allege and ultimately show: (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Simic,* 851 F.3d at 738 (citation omitted). Nitty does not plausibly allege any of these three elements.

*First*, the injury-in-fact requirement, discussed at length above, demands a "real and immediate" threat of a future violation of the plaintiff's constitutional rights. *O'Shea,* 414 U.S. at 494. This doctrine serves the important role of "preventing courts from undertaking tasks assigned to the political branches." *Lewis v. Casey,* 518 U.S. 343, 357 (1996). Nitty's entire complaint is

19

premised on the alleged excessive force and other supposed misconduct of a small number of officers on a single occasion. That may be enough, if true, to give Nitty standing to seek damages for his alleged *past* injuries, but it does not create a live case or controversy regarding any anticipated *future* harm to Nitty. *See id.* at 495–96. As the Court held in *Rizzo*, conjecture about what individual, unnamed law enforcement officers might do to the plaintiff in the future is hypothetical and too "attenuated" to confer standing regarding injunctive relief against a municipality. 423 U.S. at 372. Moreover, this Court must assume that Nitty will "conduct [his] activities within the law," *O'Shea,* 414 U.S. at 497, and thus avoid confrontations like the one that took place when Nitty and his fellow protestors blocked rush-hour traffic on Interstate 794 on the evening of June 2.

Nor do Nitty's general allegations about the Sheriff's Office's use of "riot control agents" suffice to confer standing. (*See* Compl. ¶¶ 102–13.) In the first place, Nitty does not plausibly claim that the County has any widespread policy or practice of using these agents in an unconstitutional manner. He merely points to a discrete instance when individual deputies allegedly did so on June 2 (as well vaguely alleging use of agents by some unidentified officers on June 1). (*See* Compl. ¶¶ 34–36, 40.) *Rizzo* rejected a similar effort to infer a "pervasive pattern" of unconstitutional conduct from a few discrete instances. 423 U.S. at 366. The Court was even clearer in *Lyons* that an allegation that officers "routinely" use excessive force (in that case, chokeholds) "falls far short" of Article III's demands. 461 U.S. at 105. Likewise, Nitty's general claim that the County "now has notice" of defendants' alleged conduct "as well as the use of chemical agents in unconstitutional fashion" falls far short. (Compl. ¶ 107.)

*Second*, Nitty does not allege a "sufficient causal connection" between his injuries and any supposed misconduct by the County. *Simic,* 851 F.3d at 738. As discussed above, a municipality

20

is potentially liable under § 1983 only for its own illegal acts, and not simply because its employees allegedly behaved illegally on a given occasion. *See Connick,* 563 U.S. at 60. Nitty does not point to any policy or custom on the part of the County that caused his alleged injuries.

*Third*, and relatedly, the requested injunction against the County would not redress Nitty's claimed fear of future injury at the hands of hypothetical future deputies. Many of Nitty's proposed policy terms are undefined and so vague as to be incapable of enforcement. For instance, while racial equity and health is a policy goal that Milwaukee County affirmatively embraces, the concept of "anti-racism" is subject to varying definitions, as is the question of what training would be required to verify that the Sheriff's Office and its deputies are sufficiently informed about related principles. (*See* Compl. ¶ 114.) If all Nitty means is that the Sheriff's Office must honor the Constitution's prohibition on racial discrimination, on the other hand, then his proposed injunction is effectively an order to "obey the law," which would violate the specificity requirement of Fed. R. Civ. P. 65(d)(1) and would be futile. *See Alcocer v. Bulloch County Sheriff's Office,* No. CV 615-94, 2017 WL 227793, at *6 (S.D. Ga. Jan. 18, 2017). Moreover, since the County did not itself cause Nitty's claimed injuries here, an injunction against the County would not prevent or remedy such injuries in the future.

For the foregoing reasons, Nitty lacks Article III standing to pursue his claim for injunctive relief against Milwaukee County.

### C.    The Requested Injunction Would Violate Principles of Equity, Comity, and Federalism.

Even if Nitty cleared the threshold for Article III standing, well-established principles of equity, comity, and federalism would nevertheless bar his claim for injunctive relief as a matter of law. As noted above, a federal court should enjoin a municipality only "sparingly" and in the "most extraordinary circumstances." *Rizzo,* 423 U.S. at 378–79. Principles of federalism and respect for

the municipal government's "widest latitude" in conducting its own affairs must guide the exercise of a district court's equitable powers. *Id.*; *Lyons,* 461 U.S. at 112.

These principles required the Court to abstain from enjoining the police departments in *Rizzo* and *Lyons*, and they require the same result here. Nitty's proposed injunction would rewrite the Sheriff's Office's law enforcement policies and would embroil this Court in ongoing oversight of the conduct, training, recruitment, disciplinary procedures, and use of force by the Sheriff's Office and its deputies, presumably enforced through the Court's contempt power. This would truly be a "major intrusion" into the traditional domain of local government, even greater in scope than the "ongoing federal audit" rejected in *O'Shea,* 414 U.S. at 500–02. As the Court reiterated in *Lyons*, it is not the role of a federal court, except in rare cases, to oversee the ongoing conduct of local law enforcement. 461 U.S. at 113; *see also Palmer,* 755 F.2d at 578 (cautioning federal courts not to meddle in or try to control the day-to-day operations of local government). Yet, despite this case law, Nitty asks the Court effectively to disregard the principles of comity and federalism; nothing in his complaint remotely justifies such an extraordinary request.

Even setting federalism concerns aside, the scope of Nitty's proposed injunction would violate the basic equitable principle that "the nature of the violation determines the scope of the remedy." *Rizzo,* 423 U.S. at 378. Or, as the Court formulated the rule in *Lewis v. Casey*, the "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." 518 U.S. at 357. In *Lewis*, the injury which the Court was empowered to remedy was the denial of required services to an illiterate inmate. *Id.* at 358. But the requested injunction swept more broadly, seeking remedies also for non-English speakers, prisoners in lockdown, and the general inmate population. The Court excised those portions of the requested injunction as "not the proper object of this District Court's remediation." *Id.* The Court then denied

22

the remainder of the injunction as well because "two instances were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief." *Id.* at 359.

The same flaws beset Nitty's request for injunctive relief here. He alleges one instance where the individual defendants purportedly used excessive force and unlawfully arrested him based on his race and protected speech. (*See, e.g.*, Compl. ¶ 85.) But he seeks to prohibit the Sheriff's Office from considering a laundry list of other characteristics having nothing to do with race or speech, including age, gender, economic status, and others. (*Id.* ¶ 114.) He also seeks to revamp the Sheriff's Office's recruitment and training of deputies, even though he does not claim that any failure to train caused his injuries. *Id.* These aspects of the injunction are grossly overbroad. More fundamentally, the entire injunction is unwarranted because it seeks systemwide relief across the entire Sheriff's Office based on a single incident of alleged misconduct. The Supreme Court rejected similar overreaching injunctions in *Rizzo, Lyons,* and *Lewis,* and this Court should do the same here.

## CONCLUSION

As demonstrated above, Nitty has not stated a claim upon which relief can be granted under § 1983 against either Captain Tricia Carlson or Milwaukee County. As a result, the Court should enter judgment on the pleadings in these defendants' favor on Count Five of the complaint.

Further, because Nitty has no substantive claim against the County, the Court should also dismiss Count Six seeking injunctive relief against the County. Insofar as Counts One through Four likewise request an injunction against the County, they, too, should be dismissed. In the alternative, even if Nitty has stated a plausible § 1983 claim against the County, his request for injunctive relief should be dismissed because he lacks standing to pursue it and because the injunction would violate well-established principles of equity, comity, and federalism.

Dated at Milwaukee, Wisconsin this 27th day of October, 2020.

HANSEN REYNOLDS LLC

/s/ Andrew A. Jones
Andrew A. Jones
301 N. Broadway, Suite 400
Milwaukee, WI 53202
(414) 455-7676 (phone)
(414) 273-8476 (fax)
ajones@hansenreynolds.com

EMILE BANKS & ASSOCIATES, LLC

/s/ Emile H. Banks, Jr.
Emile H. Banks, Jr.
1200 North Mayfair Road, Suite 290
Milwaukee, Wisconsin 53226
(414) 777-0000 (phone)
 (414) 777-0090 (fax)
emile@emilebankslaw.com

*Attorneys for Defendants*